19-3574CV. Thank you, Your Honor. May it please the Court, this is Taylor Wilson along with Nicole Wade and Lynn Wood. We represent the Plaintiff Appellant, Rosalyn La Liberte. Good afternoon, everyone, and thank you to the Court for carrying on its business despite the circumstances. If there's any problems, hearing me, or other technical difficulties, please let me know. We will. Thank you very much. Thank you. We're here on this defamation case following the District Court granting Ms. Reid a judgment pursuant to both Rule 12b-6 and California's anti-SLAPP statute, and hopefully we'll have the time to address both how the District Court erred on the merits and its related application of the anti-SLAPP statute in federal court. I know that Judge Jacobs and Cabranes may be chomping at the bit to finally have an opportunity to resolve the anti-SLAPP issue following decisions issued in 2013 and 16 in Liberty Synergistics and Ernst, and I figure I'll start there to make sure it receives its due attention with the intent of preserving some time to discuss with you all the merits as well. The Court should reverse the grant of the anti-SLAPP motion and the attendant award of attorneys' fees in this case irrespective of its decision on the merits of Rule 12b-6. As the Court knows, there now exists a robust circuit split on the application of the state anti-SLAPP statutes in federal court concerning whether they conflict with the comprehensive scheme embodied by the federal rules pursuant to Shady Grove. The District Court in this case followed the Ninth Circuit, though did so without analyzing the Shady Grove problem. Instead, as the Ninth Circuit does, it simply rewrote the plain language of the anti-SLAPP statute's probability requirement and supplanted it with the federal rules 12b-6 plausibility standard. The Ninth Circuit itself explicitly does this to avoid a stark collision with the federal rules, which is exactly what Shady Grove forbids. Neither the District Court nor the Ninth Circuit have articulated the authority for simply superimposing its own version of the anti-SLAPP statute despite its plain language. A boss out of the D.C. Circuit, now Justice Kavanaugh, considered and rejected rewriting the plain language of the statute to try to harmonize it with the federal rules, and it did so for good reason. The statute's language is not subject to two interpretations. The Court is not free here to choose one interpretation that avoids a conflict. If the California legislature wanted a rule 12 standard, the grant of which entitles a defendant to attorney's fees, it could have written one in, and it didn't. Shady Grove also deals with this problem while rejecting the dissenting opinion in that case. It specifically stated, and I'm quoting, the manner in which the law could have been written has no bearing. What matters is the law the legislature did enact. We cannot rewrite that to reflect our perception of legislative purpose. The dissent's concern for state prerogatives is frustrated rather than furthered by revising state laws when a potential conflict with the federal rule arises. The state-friendly approach would be to accept the law as written and test the validity of the federal rule. And I want to be clear about this because both, actually all three, Ms. Reed, the Amici, and the District Court have pointed to this Court's prior 2014 decision in Adelson and support for its application of California's anti-SLAPP here. And while it's plain from the Liberty Synergistics and Ernst decisions that this issue has not been decided, I want to stress that the Adelson Court was not confronted with the Shady Grove problem. It considered the Nevada anti-SLAPP statute that was in effect before 2013, which on its face expressly required that the anti-SLAPP motion be treated as one for summary judgment. And of course, as the Court noted, it was a codified substantive immunity suit, which this Court has already decided the California anti-SLAPP is not. And Shady Grove is clear in its mandate. We ask that the federal rules of civil procedure answer the question in dispute. If they do, and the anti-SLAPP statute attempts to answer the same question in a different way, the federal rules govern irrespective of whether the anti-SLAPP is tagged procedural or substantive under ERIE. So we first need to frame the question. Abbas, Carboni, and Klock are the better reason, better reason circuit decisions for at least two reasons. First, Shady Grove itself framed the question broadly. In that case, dealing with the New York statute that purported to limit the availability of a class action when seeking statutory remedies, statutory damages, the Court framed the question as whether the plaintiff's case may proceed as a class action and rejected a more narrow framing that could have allowed the two laws to coexist. Abbas, Carboni in the 11th Circuit, and Klock in the 5th have followed suit and framed a broad question, whether the plaintiff's complaint dates a claim for relief sufficient to avoid pretrial dismissal. And that highlights the fundamental disagreement between Rule 12, Rules 8 and 12, and the California anti-SLAPP. It's plausibility versus probability. It's a direct collision. By contrast, to look at the other side of the circuit split, we know the 9th Circuit and the 1st Circuit in Godin have framed a much more narrow question, focusing primarily on what they call a special purpose, the anti-SLAPP statute, and holding that it answers a more specific question than Rule 12, when a complaint is based upon the defendant's freedom of speech or petitioning conduct, and that the federal rules do not explicitly provide for that. But Carboni and Klock, as well as Shady Grove, have considered these issues and rejected them. And based on their reasoning, I would submit that as important as the manner in which the question is framed is the standard by which a possible conflict should be judged. I'm quoting from Klock and Carboni, applying the Supreme Court's decision in Walker. But the test of whether a conflict between the federal rules and a state statute exists is not whether it is logically possible for a court to comply with the requirements of both, but whether the federal rules in question are sufficiently broad to control the issue before the court. Both Carboni and Shady Grove explicitly rejected, as the court in the 1st Circuit in Godin held, that a special purpose distinct from that of the relevant federal rules is sufficient to eliminate a conflict between the federal rules and the state statute. And I would submit that following this standard, is Rule 12, Rules 8 and 12, sufficiently broad to answer the question and dispute, that under even the more narrow view of the question and dispute, as tailored by the 1st Circuit, must be answered in the affirmative. Yes, the federal rules answer the question, and yes, the state statute poses a conflict. There's one final point on the anti-SLAPP. We know the district court here, as I said, applied the Rule 12, D6 plausibility standard, or at least purported to, rather than the probability standard on the face of the statute. But even then, the court should reverse the district court's award of attorney's fees, because it flows naturally from its refusal to rewrite and apply the anti-SLAPP's probability standard. And the court would be in good company in doing so. Abbas did so. It affirmed on a 12, D6, but reversed the anti-SLAPP. And Clark tells us, yes. You have one more minute. Thank you. And Clark tells us the same. Under the plain language of the California anti-SLAPP statute, it's only when the special motion to strike procedure and probability standard are used and granted that the defendant is entitled to his or her attorney's fees and costs. And if you look at the cases cited by the Amici for the general proposition that state statutes awarding attorney's fees are applicable, you'll find, again, that they're only available when the party claiming fees is first won under the applicable statute. And without much time left here, I'll go ahead and open the floor for questions. Thank you. Judge Kears? No questions. Thank you. Judge Jacobs? I'm sorry, Judge Cabranes. This is Maria. I don't see Judge Jacobs being connected right now. He probably got this. Oh, he's there now. This is Judge Jacobs. I got cut off. Okay. Well, do you have any questions for counsel?  For the plaintiff, La Liberté. I'm not sure I know exactly where we are because I just got cut off and I just took just a moment ago and I just rejoined the group. But in any event, I don't have questions. I'm content to continue listening. That's fine. Now, counsel has reserved some time and I don't have any questions at this point. And we'll hear from opposing counsel. Thank you, Your Honor. Thank you, Your Honor. This is John Richmond representing Joy Reed, the District Court. Unlike my colleague, I will spend my 10 minutes speaking about the merits of the case and why the District Court correctly dismissed the claim pursuant to Rule 12B6. The District Court correctly found that the two posts at issue were protected speech under the United States Constitution and California law. The District Court could also have dismissed the amended complaint for other reasons, including under Section 230 of the Communications Decency Act. Now, there are, as you know, two posts at issue. Turning to the first in time, the plaintiff was a limited public or limited purpose public figure and that she failed to show that the defendant acted with actual malice. The plaintiff's reply brief argues that the plaintiff could only be deemed a public figure if she thrusts herself into the forefront of a public controversy or otherwise obtained special promise. I will get to that in a moment. And Mrs. Liberté certainly meets that test. But they cited the wrong stand. There are tens, if not hundreds, of federal cases and California cases that set a different and more lenient standard for determining who is a public figure. Three of those cases are cited in the District Court's decision, including the Ampex case. Those cases establish a three-pronged test. One, is there a public controversy? Two, did the plaintiff take some voluntary act through which she sought to influence that public controversy? And three, was the alleged defamation related to plaintiff's participation in the public controversy? Case after case in California has applied that test. And when a plaintiff has made public statements with respect to the issue and controversy, issued press releases, posted publications on the internet, published scientific papers, or publicly testified, in each case, the California courts have found that the plaintiff is a limited purpose public figure. On the other hand, we are unaware of any case in plaintiff's life where a person who voluntarily advocated with respect to an issue of public concern was not found to be a public figure. Now, turning to the facts here, California's sanctuary city law, SC-54, and the conduct of the anti-immigrant advocate to oppose that law were undoubtedly issues of public concern. And the plaintiff was an aggressive public opponent of SC-54. She went all over the state testifying against it. This was enough to make her a public figure. But she also saw the spotlight. She put herself at the forefront of the opposition to SC-40 and obtained special prominence through her conduct in opposing a law. It's not a coincidence that photographs of the plaintiff appeared not just in the Ventura County store, but nationally in the Washington Post. She was a presence on social media and at rallies and at demonstrations. She gave media interviews both before and after the post. Ms. LaLiberté forcefully thrust herself into the public controversy about SC-54 and cannot claim that she is not a public figure. Now, because plaintiff was a public figure, she had to show that the defendant acted with actual malice. She had to present evidence that defendant knew that the publications were false. Or sufficient evidence permits the conclusion that the defendant entertained serious doubts about the truth of the publication. It's not enough, as the plaintiff claims. That Ms. Reid failed to investigate or had a political bias against Donald Trump. Now, this is the state of the evidence at the time of the first publication. Number one, anti-immigrant protesters at the Simi Valley Council meeting hurled ugly racial slurs at teenage attendees. Two, Ms. LaLiberté was one of those protesters. Three, a photograph was taken of Ms. LaLiberté at the council meeting. That was published in the Ventura County store, where she was apparently screaming at a teenager with her hands at her throat in a menacing gesture. Four, the photograph of plaintiffs and social media posts identified her by name as being one of the persons hurling those racial insults. And those posts went viral. Five, an attendee at the identifying Ms. LaLiberté as making the racial slurs. Now, there was no public evidence available or any of the evidence available to Ms. Reid to contradict any of these things. There is not, in short, a shred of evidence to show or even suggest that Ms. Reid acted with malice toward the person that she did not know. Now, turning to the second publication, the July 1st publication, the district court got it exactly right when it found that the post was a statement of opinion that did not accuse Ms. LaLiberté of making racial slurs. Plaintiffs' position that the post accused Ms. LaLiberté of making those slurs because the old Marx Brothers line, who are you going to believe, me or your eyes? There is no mention of racial slurs in the post or even for that matter, racism or racist conduct. In fact, the caption makes reference to rage not racism and has the hashtag choose love. The July 1st post is nothing more than the defendant's opinion that the rage shown at the Simi Valley Council meeting was similar to the rage shown in Little Rock in 1956. With my remaining time, I'd like to just briefly address another base under which the district court would have dismissed the complaint. And that's section 230 of the communications decency. Whether section 230 is the defense here boils down to a single issue. Does the publication come within the protection of the act if it is substantively the same as but it's not identical? The district court rejected that on the ground that the publication was authored and posted by the defense. But that's not the test. That's true of every single publication. And if that was the test, there could never be a section 230. Excuse me, you have one more minute. Thank you. The test of whether section 230 applies should be the one that this court set out in the Redcliffe case. Whether a defendant quote, associated in the development of what made the content unlawful. Ms. Reed did not develop the content of her June 29th post. That was done by Vargas and countless others. The gist of section 230 is you can sue the original speaker, not a subsequent messenger. Here Ms. Reed was nothing more than a messenger and her post is immune from liability under section 230. Thank you. Thank you, Mr. Richman. Judge Kears, any questions? Yes, I have one question. Why is the matter of whether someone is a limited public figure a question of state law rather than federal law? Well, because it's a question of both. The California Constitution is different from the First Amendment. It provides far broader rights with respect to freedom of speech. So that there are, while there are constitutional, obviously constitutional limitations that apply to defamation cases in a line of cases regarding limited purpose public figures. California provides a much more lenient standard and that's going to apply time and time again in case after case, not just in California state case, but in federal cases involving California defamation action. Any other questions, Judge Kears? No. Judge Jacobs. Counselor, you referred to Ms. Oliberte's media appearances before and after the disputed event. What media appearances were there before? It was before the publication. It was after the publication that there was a television interview that she conducted at a Fox News station, a local Fox News station. Was that after the event or before it? It was after the event and before the publication. I see. What makes anyone think that the photograph is a picture of somebody screaming? I mean, isn't the purpose of the sanctuary law to put a gag order on police? Isn't that what she's doing is saying this is, you know, you shouldn't gag the police and she's trying to talk and she's trying to choke herself. I don't know what else that means. I'm not quite sure I understand that. I don't think there's any question that if that was what the newspaper reported that Ms. Oliberte was interacting with a 14-year-old teenage. I don't I'm not sure. I don't understand. I'm sorry I'm a bit confused by the question. The state sanctuary law would prevent the police from inquiring or reporting about the and to my eye, it looks like that's what Ms. Oliberte is doing. She's illustrating what it is to put a gag order on the police or other public officials. You open your mouth, you choke yourself off. But Your Honor, that has never been suggested by anyone that I'm aware. It certainly has not been suggested by the plaintiffs. It's never been suggested by anyone who attended the council meeting. So I guess anything is possible, but I don't see that at all. And certainly no one has the chance. Thank you. Mr. Richman, this is Judge Cabranes. Let me draw your attention to section 425.16b, the special strike provision. Your view on this is exactly what? Well, our view is generally that the district court, of course, dismissed this case under 12b6 ban. So to the extent, the only extent that really the California anti-slap law comes into play here is with respect to attorney's fees. So if we conclude that section 425.16b does not apply in the federal court, the effect would be what on the applicability of the fee shifting provision? I want to make sure I have the right part of the statute that you're referring to. Which part, your honor? 425.16b and then the fee shifting provision is 425.16c as in Charles, small c. The court need not determine the applicability of subsection b unless it finds that there are not grounds to dismiss under rule 12b6. All right. Let me ask you, speaking of that, some of these, some of your arguments seem to me to suggest that there are issues of fact here, but this was resolved on 12b6. Is that right? Yes, it was, your honor. So there was no discovery, is that correct? That's correct, your honor. So isn't one possible solution in this appeal to ask, to remand to the district court to permit a discovery process that might then flesh out some of these facts, including some of the facts that Judge Jacobs referred to? If we had a more complete record based on discovery, we would then have a record on summary judgment. Doesn't that seem an appropriate solution here? I don't believe so, your honor. There are a number of cases that deal with the question of, and have dismissed cases for failing to provide any evidence of actual malice. And I believe the way the court has said, if there's any evidence to suggest that there could be a basis for finding actual malice, then discovery would be appropriate. But in this case, there is absolutely no evidence or any evidence suggesting other evidence that Ms. Reed acted with actual malice. I mean, what would there be? What would discovery show or conceivably show with respect to the information that Ms. Reed had about a person in California who she did not know and had no relationship? Internal memos, I assume. I'm sorry? Judge Jacobs. I mean, if you have discovery, you would get internal memos. Internal memos about what? I mean, there's no internal memos indicating hostility and a disregard for truth and the opportunity to make an example of somebody that the defendant disagrees with. I'm not saying such a document exists. I'm just saying a document, if it existed, would be telling. Well, but there's no basis to believe that such a document would exist. It's not something that would be done in the ordinary course of business or anything like that. I mean, what happened here was fairly simple and was straightforward. There was a June 26, very ugly counsel. And then there was a lot of basically social media activity involving, including the tweeting and retweeting of the photograph. And all that Ms. Reed did was pick up on what had been reported all over social media about the ugliness that occurred at that counsel meeting. There is nothing to suggest anyway that there would be some sort of internal memo or that somehow Ms. Reed would be going after this particular person. I mean, it doesn't, there has to be something more than rank conjecture in order to, for a complaint, defamation complaint of this kind to survive. Well, this is Judge Cabranes. I guess opposing counsel who has reserved some time for rebuttal may wish to tell us whether we have a situation here that can't be handled on 12B6. I do note for the record that this is a so-called expedited appeal. We have an internal practice or rule which permits expedited consideration of cases or appeals from decisions of district courts based on 12B6 on the theory, of course, that it might in some circumstances eliminate the need for extended discovery. I mentioned this only because this is an expedited appeal and it's not as though we would, there's been a lot of time wasted so far, as it were, or consumed by discovery. And I'm wondering whether there isn't, this is not a situation in which there are material issues of fact in dispute. But let me hear from, let us hear from Mr. Richman on that question and others. I'm sorry, Your Honor. Did you want to hear from me, Mr. Wilson? I'm sorry, Mr., let me see who is, plaintiff counsel. I didn't catch the name of counsel for the plaintiff appellant. It's Taylor Wilson, Your Honor. Taylor Wilson, okay. We had the name of. Thank you very much. Taylor Wilson, okay. Mr. Wilson, why don't you. Thank you very much. Sure. So Judge Keir has asked the question about whether public figure is a matter of federal law and it is, but even if it were not, the California constitution, Mr. Richman's right, the California constitution is different because the California Supreme Court has told us it is, in fact, it contains provision that subjects the media to liability for the abuse of free speech, which the federal constitution does not. And for that reason has rejected any more expansive protection from defamation liability than the federal constitution. There's also some question about when Mrs. LaLiberte's media appearances were. Her sole voluntary conduct prior to the accusations was her civic duty and appearing at city council meetings. And I don't think we want our citizens to be weighing the benefits of participating as private citizens versus the risks of being libeled. And the interviews, the interview that was with Fox was the same day as Ms. Reed's first accusations. And that interview is no more media access, which Gertz talks about, than any private citizen would expect to have when these types of accusations are made, false accusations are made, especially in the authority that merely exercising your right to participate in local government makes you a public figure. Mr. Richman also, yes. You have one minute left. Thank you. Mr. Richman also continued to talk about evidence of actual malice. We don't have, there is no evidence as the court has pointed out, because there is no discovery. Mr. Richman wants to talk about facts that are in the 1986 order, that yes, discovery would allow the court to rule on a more developed record. And I would submit that the allegations of the amended complaint on actual malice, if he is a public figure, are sufficient. We have a single biased source. We have a single biased accuser. We have the single biased accuser materially changing that teenage political activists that Ms. Reed relied on, her only source, said that an unspecified they had yelled racial slurs. It was Ms. Reed who changed the they to Mrs. LaLiberte specifically. And we know that despite her own bias, despite Mr. Vargas' bias, and despite changing the quote, Ms. Reed did absolutely nothing to investigate. And that's Mrs. LaLiberte, because she's a Donald Trump supporter. And I believe I heard the court ask about sending it back down. Yes, the court could do that. And I think it would help the court to rule on a developed record. I think Mrs. LaLiberte is entitled to that. But I also think that on 12 v. 6, that she's alleged a case of actual malice. So, yes, you've identified a question that I was going to ask you. If we don't remand for discovery, etc., what is the decree that you think we can have, which would vindicate your client's interests? Can we reverse outright? Absolutely. This court can reverse outright. One, what if you have a limited purpose? I'm sorry? On what theory or how? Yeah, on any alternate theory that she is not a limited purpose public figure and only had to allege negligence, which she clearly did, or even if she is a limited purpose public figure, which I think the court would also benefit from discovery on that issue. But even if she is a limited purpose public figure, that she has alleged all of that type of circumstantial evidence that this circuit and the Supreme Court and the state of California tell us make out a plausible case for actual malice. I think what the district court actually did here was decide for itself that it's plausible that Ms. Reed didn't act with actual malice. She never even addressed in her order, didn't even attempt to address in her order, the accusations of the circumstantial evidence that Mrs. LaLiberte has alleged to show a plausible case of actual malice. And the discovery, as Judge Jacobs, rightfully pointed out, right now is a black box and may reveal evidence of actual malice, given the recklessness that's been pled. While we have you up, why don't you marshal, if you would, the issues of fact that you think are on this record and that are material and that would be pursued in a putative remand? Sure. The issues of fact are, one, what did Ms. Reed actually know? Mr. Richman continues to talk and suggest, there's no evidence in the record, and if there were, it's well outside the four corners, that Ms. Reed was somehow relying on anyone other than this sole, single, teenaged political activist. We need to know that. We also need to know what went on on her own social media account between June 29th and July 1st, what internal correspondence there may be predating and during this episode about Ms. Reed's own hostility and bias against President Trump and his supporters. We need to know what she did, if anything, to try to ascertain the truth of this, given what we have alleged is a purposeful avoidance of the truth by relying on one's sole biased source, which is best explained by her own animus. We also need to know, and I think Judge Jacobs touched on this, what actually happened. What would Ms. Reed have found out? We know that Mrs. LaLiberte didn't do the things that she's accused of, and I would point the court to the video that is incorporated into the amended complaint of the actual interaction. Nothing of the sort occurred. Not only was there video evidence showing that this did not happen, but we also know that Ms. Reed did nothing to ascertain if it happened and changed what was being said about the event, that somebody, we don't know who, somebody may have yelled racial slurs at this nice young man. We need to know why she felt entitled to change that sole source quote to say that it was Mrs. LaLiberte that did that. Okay. Thank you very much, Mr. Wilson. Mr. Richmond's time is exhausted, but given the exchange we have just had with Mr. Wilson, perhaps Mr. Richmond will take 30 seconds or a minute to just comment on the possibility of the material issues of fact. Yes. Thank you, Your Honor. The complaint, what the complaint was, was not that Ms. Reed had any information, but that she failed to investigate beyond what Mr. Richmond said. She said she had internal memos, not that there was any other evidence out there, that it was a failure to investigate. And case after case has stated, as a matter of law, that the failure to investigate does not establish actual amount. And that's precisely why this case should be dismissed under 12B6 stance, because that's the accusation against her. It really comes down to two things. She didn't investigate, and she had a bias against Donald Trump. And that's what it says in the papers repeatedly. And those... Thanks very much, Mr. Richmond. Much appreciated. We thank both counsel for arguments, and we'll reserve the decision.